# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 12, 2005

## STATE OF TENNESSEE v. JEFFREY HOPKINS

**Appeal from the Circuit Court for Tipton County**
**No. 4834     Joseph H. Walker, Judge**

---

**No. W2004-02384-CCA-R3-CD  - Filed September 23, 2005**

---

The defendant, Jeffery Allen Hopkins, appeals his Tipton County convictions of first degree felony murder and especially aggravated robbery, arising from the December 20, 2003 shooting death of Ricky Lumpkin.  The defendant received a sentence of life imprisonment with the possibility of parole for the felony murder conviction and 20 years for the especially aggravated robbery conviction.  On appeal, the defendant contests the sufficiency of the evidence to support these convictions.  Unpersuaded that the state's evidence was legally insufficient, we affirm the trial court's judgments.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Gary F. Antrican, District Public Defender; and David S. Stockton, Assistant Public Defender, for the Appellant, Jeffrey Hopkins.

Paul G. Summers, Attorney General & Reporter; Seth P. Kestner, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Walter Freeland and Colin Campbell, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

In the light most favorable to the state, the evidence at trial showed that the defendant shot his male roommate, Ricky Lumpkin, staged the crime scene to give the appearance that the victim had committed suicide, and then gathered the victim's puppy and cellular telephone and drove away in the victim's truck.  The defendant was apprehended nine days after the shooting in Horn Lake, Mississippi.

Tipton County Deputy Sheriff Robert Akers testified that on the afternoon of December 21, 2003, he and Deputy Giambra were dispatched to investigate a possible homicide at

a trailer home located at 531 Randolph Road.  When the officers arrived at the trailer, the front door was closed, but the back door was unlatched and partially open.  Deputy Akers entered the trailer and discovered in the bedroom a male body with a gun in his hand.  Deputy Akers did not touch the body; instead, he secured the trailer by roping it off with crime scene tape, and Deputy Giambra radioed for a crime scene investigation team.  In the meantime, Deputy Akers began filling out a crime scene log, and he remained at the scene until approximately 11:30 p.m.

Criminal Investigator Billy Daugherty testified that he responded to the officers' request for a crime scene investigator.  He believed he arrived at the trailer at approximately 3:51 p.m. and met another crime scene investigator, Richard Nessly.  The trailer was located in the Randolph community, "just a couple of miles from the Mississippi River."  The physical address for the trailer was 1016 Needham Road, on the property behind the residence of the victim's parents at 531 Randolph Road.  A white Corvette, titled in the victim's name, was parked by the trailer.

Investigator Daugherty testified that he spoke briefly with Deputy Akers, after which he entered the trailer through the open back door.  In the bedroom, Investigator Daugherty observed a male figure lying face down on the bed with a small caliber handgun in the his right hand.  Investigator Daugherty also observed "a small amount of blood on the floor and on the bed" and piles of clothing in the floor by the back door.

Upon further inspection, Investigator Daugherty noticed things that "disturbed" him about the apparent suicide.  For example, there were bloody shoe prints on the floor and under some clothing; the victim, however,  was shoeless, and his feet were crossed.  Investigator Daugherty was likewise disturbed by the gun being in the victim's hand.  He explained that with shooting suicides, the victim either drops the weapon or a "cadaveric spasm" occurs, and the victim's fingers have to be pried open to remove the gun.  The finger of the victim in the trailer was "still laid inside the trigger guard of the gun, but in a relaxed position," which Investigator Daugherty said that he had never before encountered with a suicide.

Investigator Daugherty testified that he found a "suicide note" on the night stand, which was addressed to the victim's mother and contained an apology for committing suicide.  To Investigator Daugherty, the "odd" part of the note was its reference, "Call Jeff.  He has  my truck and cell phone."  Another unusual piece of evidence, according to Investigator Daugherty, was the presence of small splotches of blood on the door handle of the clothes dryer, which appeared to have been transferred when someone with blood on their hand touched the handle.  Investigator Daugherty said that he "found it to be odd that the victim would shoot [himself] in the back of the head, and then go in and open the dryer door."  He also discovered blood droplets on the carpet in the bathroom, a swipe of blood on the curtain behind the night stand, and a blood smear pattern on the floor between the night stand and the bed that "looked like somebody had actually taken and wiped blood up from the floor."  Based on the unusual appearance of the crime scene, Investigator Daugherty requested that the TBI Crime Scene Unit be responsible for processing the scene.

As Investigator Daugherty waited for the TBI Crime Scene Unit to arrive, he continued to search through the trailer. He found a notebook on the top of a large stereo speaker in the living room. He said that the notebook contained "what appeared to be a practice suicide note, where one had been drafted, just almost similar to the one that [he] had found in the bedroom."

On cross-examination, the defense elicited Investigator Daugherty's opinion that he did not believe that the victim was shot while he was lying on the bed. He could not say, however, where the victim and the shooter would have been standing at the time the gun was fired. He noticed that there did not appear to be any "stippling" around the entry wound in the victim's head, indicating to Investigator Daugherty that the shot was fired at a distance greater than 24 to 36 inches. Although the trailer was searched, the officers found no other signs of a struggle, and the only bullet recovered was from the victim's head.

The state called the victim's mother, Rita May Lumpkin, who testified briefly. She identified the victim as her 45-year-old son, Ricky Lumpkin. She testified that her sister, Frankie Gideon, had died Friday, December 19, 2003. That evening, Ms. Lumpkin spoke to her son, and they arranged to leave the next day at 11:00 a.m. to view the body and eat with family members. On Saturday morning, Ms. Lumpkin noticed that the victim's 1995 blue Ranger truck was not parked at the trailer; the victim's Corvette, however, was present.

Ms. Lumpkin identified the defendant by name and as the person she had seen several times at the trailer with the victim. She added that she had seen the defendant "twice that Saturday morning coming out to the Corvette." She believed that the defendant had been around "[s]everal months on and off, but not constantly."

The state showed Ms. Lumpkin the "suicide note" found inside the trailer. She testified unequivocally that the note was not in her son's handwriting.

TBI Special Agent Donna Turner testified that she was a field agent assigned to Tipton and Lauderdale counties. She was dispatched to the trailer to assist Investigators Daugherty and Nessly. During the course of the investigation, the defendant became a suspect in the victim's death. Agent Turner participated in the defendant's capture and arrest in Horn Lake, Mississippi on December 29, 2003.

Previously, Agent Turner had established telephone contact with the defendant by asking his friends and relatives to relay a message to call Agent Turner. She first spoke with the defendant, who called on the victim's cellular phone, on December 23. Agent Turner testified that the defendant remarked, "Well, you know I did it." When Agent Turner tried to persuade the defendant "to turn himself in to the nearest law enforcement agency," the defendant balked, saying that he wanted to spend Christmas with his relatives. The defendant, however, did reveal to Agent Turner the location of the victim's truck; it was parked at Super K-Mart in Southaven, Mississippi. He also promised to surrender on Sunday at 3:00 p.m. at McDonald's on Getwell in Memphis, but he did not do so. Agent Turner had another conversation with the defendant on December 29, and

she was able to trace his location to Horn Lake. Other agents were dispatched to a Horn Lake residence where the defendant surrendered without incident.

Agent Turner drove to Horn Lake and interviewed the defendant at the local police department. She advised the defendant of his rights, and he signed a rights waiver and gave a statement. The defendant's statement was reduced to writing, and Agent Turner read the statement out loud for the jury. In his statement, the defendant related that Friday evening, December 19, he and his "roommate," the victim, drove to a house in Midtown Memphis to purchase Xanax. The customary "seller" was away, but the seller's friend invited them into the residence where they stayed for approximately one and one-half hours. After they left, the defendant asked the victim to drive him to see his fiancé, Kristen. The request angered the victim, and the defendant said that the victim accused him of being "an ungrateful son of a bitch." In his statement, the defendant claimed that the victim demanded that he get out of the vehicle, which the defendant did not do, whereupon the victim started scratching and hitting the defendant. After a time, the victim calmed down. The two men returned to the trailer and "rolled a joint and smoked it." According to the defendant's statement, the victim gave the defendant an ultimatum to choose between his fiancé and the victim.

The defendant said in his statement that the next morning, he again told the victim that he wanted to see his fiancé; the request prompted the victim to kick the defendant and to threaten to kill the defendant. The encounter escalated to the point that the victim retrieved his gun from the bathroom, confronted the defendant in the bedroom, and threatened that if the defendant "mess[ed] up" one more time "that would be the end of [the defendant]." The defendant told Agent Turner that he shoved the victim toward the hallway, that the victim fell, and that when he stood up the victim returned the gun to the bathroom and placed it on the washing machine. When the victim returned to the living room, he told the defendant that he had a headache from all the screaming and was going to lie down in the bedroom.

In his statement, the defendant next explained that he went to relieve himself in the bathroom and saw the gun on the washing machine. His statement continues,

> I saw the gun and started freaking out. I blacked out. I came to. I was sitting in the living room with the gun pointed at my face. I went back to the bedroom and saw [the victim] laying there bleeding.
>
> I dropped the gun on the floor. I knew I had done it because no one else was there. [The victim] had one gunshot wound. I grabbed some towels and tried to stop the bleeding, but I couldn't. He had no pulse. I was tripping. I was hyperventilating. I grabbed the bloody towels and threw them in the back of the bed or the truck . . . . I got a piece of paper and wrote a note. I don't remember exactly what I wrote, but it was pertaining to a suicide note. . . . I got the gun, which was in the floor near the hallway. I picked it up, wiped the side of the gun off, and put it in [the victim's] hand. That was to make it look like [the

victim] had shot himself. . . . I got the dog and left in [the victim's] blue truck.

The next section of the defendant's statement described the different places he stayed after leaving the trailer, his conversations with law enforcement officers, how he disposed of the victim's truck, and his arrest in Horn Lake. The final portion of the defendant's statement detailed his relationship with the victim. He described meeting the victim approximately one year earlier in Overton Park. The defendant was homeless at the time, and the victim gave him a place to stay in exchange for doing "chores." According to the defendant, two months into the relationship, the victim solicited the defendant to have sex. The defendant declined, but he claimed that the victim "forced sex on [him] 25 or 30 times." The defendant denied ever willingly engaging in sex with the victim, who threatened the defendant with again being homeless and who hit and was verbally abusive to the defendant. The defendant described the victim as being "like a tick" and always wanting to know the defendant's whereabouts and activities.

The state asked Agent Turner about the victim's dog that the defendant took with him when he left the trailer. The agent explained that she first saw the dog with the defendant's grandmother; the dog escaped, but it was later recovered and turned over to the victim's parents.

Deputy Richard Nessly was in the chain of custody for some of the evidence. He testified that on December 31, 2003, he proceeded to the medical examiner's office in Memphis to collect fingernail clippings from the victim, the fatal bullet and bullet jacket, and multiple DNA swabs. He delivered the items to the TBI crime laboratory in Nashville.

Another chain-of-custody witness, Deputy Shannon Beasley, testified that he received from Deputy Daugherty and took custody of numerous items collected at the crime scene and a sealed blood alcohol kit referencing the defendant. Deputy Beasley delivered the items to the TBI crime laboratory in Nashville.

Deputy Reserve Officer Richard Singletary, a third chain-of-custody witness, testified that Deputy Beasley released to him various sealed containers. Deputy Singletary delivered the items to the TBI crime laboratory in Nashville.

TBI Special Agent Sean Nash assisted Agent Turner in investigating the Ricky Lumpkin homicide. Agent Turner supplied him with the number assigned to the cellular telephone that the defendant had been using. Agent Nash subpoenaed billing and calling information from Verizon Wireless regarding the number. Verizon's records confirmed that the customer assigned to the cellular telephone was the victim.

TBI Special Agent Steve Scott was a member of the violent crime response team that was "called out" to the homicide scene on December 21. Four other response team members accompanied him to process the scene. Agent Scott identified diagrams of the scene and various pieces of evidence that were collected. Agent Scott also was assigned to the firearms identification

section of the TBI laboratory, and in that capacity, he compared the handgun found in the victim's hand with a fired bullet and bullet fragments recovered from the victim's body. Agent Scott testified that the bullet recovered was fired from the handgun found at the scene. Working from his notes, Agent Scott testified that his team collected 13 items at the scene, including the "suicide" note on the night stand. He received the other suicide note from Deputy Daugherty, who had already collected the note and placed it in a sealed envelope. The items were packaged, marked for identification, and transported in the response team's vehicle to the crime laboratory.

Special Agent Darrin Shockey, a response team member and latent fingerprint examiner, testified that he examined and analyzed the second note for the presence of fingerprints. He explained that he found one fingertip with an identifiable ridge detail on the note. He compared the fingertip with a known set of the defendant's fingerprints, but "the tip was not sufficient on the fingerprint card to be able to make a complete comparison." Agent Shockey also examined the note found on the night stand in the trailer, and he found identifiable latent fingerprints on it. He testified that he compared those latent prints with the defendant's known fingerprints, and his comparison revealed that the right and left thumb prints of the defendant matched the latent fingerprints on the note. Working from postmortem fingerprints of the victim, Agent Shockey was unable to identify any of the latent prints as being those of the victim.

Special Agent Michael Turbeville, a response team member and a serology/DNA examiner, identified the evidence that was submitted to him for analysis. The evidence included a swab from the clothes dryer, a carpet sample taken from the bathroom, and a white shirt. He also received blood samples from the defendant and blood and body swabs from the victim. From his analysis, he concluded that the DNA extracted from the clothes dryer, the carpet sample, and the white shirt matched the victim's DNA.

Doctor Teresa Campbell, a forensic pathologist, performed the autopsy on the victim's body. She testified that the cause of death was a gunshot wound to the head. The bullet entered the back of the victim's head, almost midline. Doctor Campbell found no exit wound, and her examination revealed that the fatal injury "was not a close gunshot wound." In her opinion, the fatal wound was not self-inflicted.

At the conclusion of Dr. Campbell's testimony, the state rested its case.

The defense called the defendant's grandmother, Linda Shuler. Following numerous hearsay objections that were sustained, Ms. Shuler testified that the defendant came to her house on Saturday, December 21, and that the two of them spoke on Sunday. She described the defendant has having scratches on his face and chest. Based on statements made by the defendant, Ms. Shuler called E911 after the defendant left her house. She reported that she believed a crime had been committed. The police came to her house on Sunday and took her information. Ms. Shuler testified that she again saw the defendant "within a day or two." At that time, she told the defendant that "he needed to turn his self in." Ms. Shuler recalled seeing the defendant arrive in a blue truck, and he had a cell phone and a little dog with him. According to Ms. Shuler, when her grandson made

weekend visits two or three months earlier, he was driving the same truck and had the same cell phone with him.

The defendant took the stand in his own defense. He testified that the victim came home at approximately 7:30 p.m. on Friday evening. He and the victim talked, "smoked a joint," and drove to another house. After leaving that house, they stopped at Sonic on Highway 51 in Millington and ate. They next drove to Midtown to find a person, Eric. Eric was not at his residence, but the defendant and the victim stayed at the residence approximately one and one-half hours. The defendant testified that after leaving, he asked to use the victim's phone, and he called his girlfriend, Kristen. He recalled arguing with Kristen over the phone, and he wanted the victim to drive to a house where Kristen was spending the night to "see if everything was okay." The defendant said that at that point, the victim began cursing and told the defendant that he was "too worried about her, [he] need[ed] to quit worrying about her and worry about [the victim] and worry about [himself]." Also, "some fists were thrown." Afterward, the victim and the defendant drove to the trailer.

The defendant testified that at the trailer, he and the victim argued a little bit but ended up smoking a joint and going to sleep. The next morning, the defendant renewed his request for the victim to take him to see Kristen. The victim began cursing again, and the men started fighting in the living room. At some point, the victim retreated to the bedroom. The defendant testified that he "got tired of all the abuse, and [he] did what [he] did." He added, "It was an accident." The only other details the defendant provided were picking up the victim's gun and shooting the victim as he was lying on the bed.

The defendant next spoke of his relationship with the victim and how they met. The defendant, who "was trying to make some money hustling" in Overton Park, first met the victim at the park. The defendant did not elaborate on the meeting; he testified that after meeting the victim two or three more times, the victim offered him a place to stay, which the defendant, who was homeless at the time, accepted. The defendant claimed that "everything was cool for a while," after which the victim "started wanting to control" the defendant and telling him "what [he] could and couldn't do." The defendant described the victim's behavior as trying to be the defendant's father.

Regarding the blue truck, the defendant testified that he had driven it countless times and that he was even listed as a driver on the victim's car insurance. The defendant said that he had his own Cricket cell phone but that after 9:00 p.m., the victim would allow the defendant to use the victim's cell phone. The defendant confirmed that the victim had a dachshund puppy, and he admitted that he intentionally took the puppy with him after shooting the victim. The defendant denied that he planned to keep the truck, and he specifically denied shooting the victim to take the truck or to steal the puppy. The victim's cell phone was in the truck when the defendant left.

The defendant described his activities after leaving in the truck. He emphasized that he called Agent Turner, admitted to shooting the victim, and told Agent Turner where he had parked

the victim's truck. He likewise emphasized that he told his uncle, Kristen, another friend, and his grandmother what had happened.

On cross-examination, the defendant said that he moved in with the victim in January 2003. The defendant was evasive about meeting the victim but finally admitted that he was "in Overton Park turning tricks" and that he engaged in sex with the victim in exchange for money. Despite the defendant's earlier testimony that he did not want the victim advertising his alternative life style, the defendant conceded that he was openly a male prostitute; he insisted, however, that his close friends were unaware of his prostitution.

The defendant further testified on cross-examination that the victim offered him a place to stay and steady employment in exchange for helping around the house and that the victim was seeking a monogamous, homosexual relationship with the defendant. The defendant said that he did not want to be in a relationship with a man, and he agreed that he did not want to be with a man unless it was for money. At one point, the defendant moved into an apartment with his mother for a brief time. He said that the victim still allowed him to drive the truck, even though the defendant was staying with his mother. The defendant and victim, however, also met "once in a while" to engage in sex. During this time, the defendant was not working; he quit the job that the victim had arranged for him and was selling cocaine.

After substantial prodding by the prosecution, the defendant admitted that he did not want a regular job; he could make more money – up to $700 per week – as a male prostitute, and he was also making money selling cocaine. The reality of the situation, the defendant conceded, was that the defendant was living off of the victim, and if anyone was a "tick," as the defendant had used that term in his statement to Agent Turner, it was the defendant and not the victim.

In terms of the defendant's motives for shooting the victim, the following exchanges occurred during cross-examination:

Q.     Well, did you kill him, then, because you were afraid he was going to kill you first?

A.     That's, I'd say, 45 percent of why.

. . . .

Q.     Mr. Hopkins, I just want to know your theory about why you killed Ricky Lumpkin. Did you kill him because it was an accident?

A.     It was because of a heated fight.

Q.     So you killed him because there was a fight?

A.     Yes, sir, it was.

. . . .

Q.     The fact of the matter is, you were just mad at him?

A.     Yes, that had another 25 percent of it.

Q.     All right.  And you were mad at him because he tried to be your father?

A.     Yes, sir.

. . . .

Q.     That's why you shot him in the middle of the back of his head wasn't it?

A.     It was because of a heated fight, as I said before.

Q.     A heated fight that made you mad?

A.     Yes, sir.

Q.     The heated fight was about your 14-year-old girlfriend?

A.     Yes, sir.  That had another 25 percent of it.

Q.     Ricky Lumpkin would not let you borrow his truck to go see your 14-year-old girlfriend?

A.     That had nothing to do with the reason he was shot, because I could have easily taken the gun and just taken the truck and left. That had nothing to do with it.

. . . .

Q.     Did you give Uncle Dicky any reason that you had killed Rick?

A.     No, sir, I haven't.

Q.     Well, did you say you'd been raped?

A.     No, sir, I didn't tell him that.

. . . .

Q.     You're not suggesting, then, that that is the reason; that you were raped and killed him?

A.     I'm not saying that's not the reason.

Q.     Well, tell us, then; is it the reason?

A.     That's one of the reasons, yes.

. . . .

Q.     It was not an accident?

A.     No, it wasn't an accident.

Q.     You knew what that gun was?

A.     Oh, I knew what it was.

. . . .

Q.     . . . You took that cell phone so you could coordinate your drug deals and your getting around and about, after you killed your roommate; isn't that right?

A.     Yes, sir.

Q.     And you took the truck to get away, didn't you?

A.     I don't know why I took the truck. I just took the truck to leave, yeah, basically.

At the conclusion of the cross-examination, the defense rested its case. Based on the evidence presented, the jury found the defendant guilty of first degree felony murder and especially aggravated robbery.

On appeal, the defendant raises the sole issue of the sufficiency of the convicting evidence.

A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a guilty verdict destroys the presumption of innocence and replaces it with a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court must reject a defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the state's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.

*Especially Aggravated Robbery*

First we review the challenge to the evidence supporting the conviction of especially aggravated robbery. The indictment in this case specifically identified the property as "a 1995 Ford Ranger pickup truck, one Motorola cellular telephone and one Dachshund puppy." A person commits especially aggravated robbery who commits a robbery with a deadly weapon and when the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2003). Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103.

The defendant contends that the evidence does not support a finding that he intended to deprive the victim of his property or that the gun was used to accomplish the theft. He insists that the "phony suicide note" was calculated to prompt a family member to call the cellular phone number and report the victim's death, at which time the defendant would return with the victim's phone, truck, and puppy. He also insists that the gun was used to kill the victim after which he simply departed with the victim's truck, phone, and puppy.

An argument attacking an especially aggravated robbery conviction, similar to that advanced by the defendant in this case, was considered and rejected by our court in *State v. Wade P. Tucker*, No. M2001-02298-CCA-R3-CD (Tenn. Crim. App., Nashville, July 17, 2002).

-11-

Before analyzing the claim that the intent to steal the victim's property had not been formed at the time of the assaults, we briefly dispose of the claim that the defendant did not intend to deprive the victim of her property. The trial court essentially held that it was immaterial whether the defendant had a purpose of depriving the victim of her property. We agree. By inserting as an element of theft that the offender must obtain the property "with the intent to deprive the owner" of the property, the legislature obviously did not intend that the offender's purpose must be the owner's loss or deprivation. *See* Tenn. Code Ann. § 39-14-103 (1997). If that were the meaning of the element of intent to deprive, almost no asportation of property would be proscribed by Code section 39-14-103. We judicially know that a thief's primary purpose is to profit or otherwise benefit from his ill-gotten gains; yet, we understand that such a purpose equates to an intent to deprive the owner of the stolen property for purposes of Code section 39-14-103. Thus, regardless of the ultimate motive or purpose, the offense is established when the evidence shows that the defendant intended to deprive the owner of property when the defendant knowingly obtained or exercised control over the property.

Slip op. at 5.

In this case, regardless whether the defendant's purpose in taking the truck, phone, and puppy was – as the defendant put it – "to cover his actions," he, nevertheless, intended to commit actions which had the effect of depriving the owner of his property. The conviction, consequently, is not infirm on this basis.

As for the claim that the robbery was not accomplished with a deadly weapon, that argument also was considered and rejected in *Wade P. Tucker*.

In this part, we address whether it is material to a charge of especially aggravated robbery that the defendant may not have intended to steal the victim's property at the time he shot her. As is pertinent to the present case, the robbery statute requires that the defendant intentionally or knowingly steal property from another "by violence." Tenn. Code Ann. § 39-13-401(a) (1997) (emphasis added). When the robbery is accomplished with a deadly weapon and the victim suffers serious bodily injury, the offense becomes especially aggravated. *Id.* § 39-13-403(a) (1997). The statutes contain no express requirement that the purpose to steal must coincide with the violence or serious bodily injury or that the assault be for the purpose of theft.

The state relies upon *State v. Shawnda James*, 1999 Tenn. Crim. App. LEXIS 865, No. 01C01-9803-CC-00093 (Tenn. Crim. App., Nashville, Aug. 11, 1999), *perm. app. denied* (Tenn. 2000), in which the defendant was convicted of first-degree, premeditated murder and especially aggravated robbery of the victim, despite her contention that, because the post-killing theft was an afterthought, she was guilty of mere theft and not especially aggravated robbery. This court concluded that defendant James was able to steal the victim's property because she previously had shot and killed the victim. *Id.*, slip op. at 13. Essentially, the *Shawnda James* panel held that, based upon the taking of the victim's property in the wake of the murder, it was immaterial whether the defendant intended to commit theft when she shot the victim.

In *Shawnda James*, this court followed what has been characterized as the "traditional rule" that the state need not prove that the defendant assaulted the victim for the purpose of theft, when the proscriptive statute does not recite that the "force must be used for the purpose of committing the theft." *See* 2 Wayne R. Lafave & Austin W. Scott, Substantive Criminal Law § 8.11 at 454 (1986). Rather, the nexus between the theft and the antecedent assault is supplied when the defendant merely exploits the victim's disabled condition by stealing the victim's property. *Id.*; *accord State v. McKinney*, 265 Kan. 104, 1131, 961 P.2d 1, 7-8 (1998) ("Under factual circumstances where a defendant shoots his victim and later decides to take and remove the victim's personal belongings and where the act of force and the taking of the property are so connected as to form a continuous chain of events so that the prior force makes it possible for the defendant to take property from the victim's body without resistance, that is sufficient for a conviction of the crime of robbery."); *State v. Mason*, 403 So. 2d 701 (La. 1981) (holding that acts of violence need not have been for the purpose of taking the property); *Stebbing v. State*, 299 Md. 331, 353-54, 473 A.2d 903, 914-15 (1984) (holding that the taking of property still constituted a robbery even though the original attack may not have been committed for the purpose of taking the victim's property); *Chappell v. State*, 114 Nev. 1403, 1408, 972 P.2d 838, 841 (1998) ("In robbery cases it is irrelevant when the intent to steal the property was formed."). According to this view, whether the defendant had formed an intent to steal from the victim at the time of the assault may be immaterial to whether he committed robbery.

*Wade P. Tucker*, slip op. at 5-6; *accord State v. Roderick Davis*, No. W.2003-02338-CCA-R3-CD (Tenn. Crim. App., Jackson, Dec. 13, 2004), *perm. app. denied* (Tenn. 2005); *State v. Jason R. Garner*, No. W1999-01679-CCA-R3-CD (Tenn. Crim. App., Jackson, Mar. 14, 2003)*, perm. app. denied* (Tenn. 2003).

Pursuant to the "traditional rule" outlined above, the state in this case was not required to prove that the defendant shot the victim for the purpose of theft. The evidence, we hold, was legally sufficient to support the defendant's especially aggravated robbery conviction.

### Felony Murder

From the defendant's brief and argument on appeal, we glean that the primary thrust of his challenge to his felony murder conviction is that the state failed to prove that the homicide was "in the perpetration of" or the "attempt to perpetrate" a robbery. *See* Tenn. Code Ann. § 39-13-202(a)(2) (2003) (defining felony murder as a killing of another "committed in the perpetration of or attempt to perpetrate" certain enumerated felonies). This statutory language and the rationale for the felony murder rule require an analysis different from the determination of evidence sufficiency for the separate crime of especially aggravated robbery.[1]

Consideration of this issue requires that we journey into the legal territory carved out by our supreme court in *State v. Buggs*, 995 S.W.2d 102 (Tenn. 1999). We note at the outset that neither the state nor the defendant discusses or even references the *Buggs* opinion in the briefs on appeal. Indeed, the state cites no legal authority whatsoever in support of its argument that a rational jury could have easily concluded that the defendant committed the offenses of first degree murder and especially aggravated robbery.

Inasmuch as the parties have provided no illumination on the issue, we begin with a clean slate, guided by the sound principles of appellate review of evidence insufficiency claims and by the existing precedent of *Buggs*. As we shall explain, we hold that the evidence was legally sufficient to support the defendant's felony murder conviction.

In *Buggs*, a felony murder case, the defendant stabbed his girlfriend to death after he "snapped" during an argument. 995 S.W.2d at 104. Afterward, he stole the victim's cash and used

---

[1] At the time the defendant was indicted, the statute in effect defined felony murder as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2) (2003). The previous statutory version had included the element of reckless intent, but that element was removed by statutory amendment effective July 1, 1995. *See generally State v. Sledge*, 15 S.W.3d 93 (Tenn. 2000). We mention this change because the indictment in the record before us alleges that the defendant "on or about December 20, 2003, in Tipton County, Tennessee, and before the finding of this indictment, did unlawfully, feloniously and recklessly kill Richard L. Lumpkin during the perpetration of robbery, in violation of T.C.A. 39-13-202." We have not been favored with a transcript of the jury instructions delivered by the trial court; hence, we are unaware which version of the felony murder statute was charged to the jury. Even so, the defendant's evidence insufficiency claim is unaffected.

it to purchase cocaine. *Id.* Despite Buggs's characterization of the decision to steal the money as an "afterthought," *id.* at 103, our supreme court held that the evidence was sufficient to convict Buggs of felony murder committed in the perpetration of a robbery.

The supreme court first summarized existing Tennessee law as *not* requiring that the felony necessarily precede the murder to support a felony murder conviction. "The killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of the felony offense, so long as there is a connection in time, place, and continuity of action." *Id.* at ___. That said, the court then acknowledged that, in a felony murder case, when the killing precedes the commission of the predicate felony, "there is a split of authority [among] the various jurisdictions as to *whether intent to commit the felony* must exist concurrently with the commission of the homicide, or whether intent formed after a killing is nonetheless sufficient to bring a case within the felony-murder rule." *Id.* at 106 (emphasis added). The *Buggs* court adopted the "prevailing view" and ultimately concluded that "for the felony-murder doctrine to be invoked, the actor must intend to commit the underlying felony at the time the killing occurs." *Id.* at 107. The court explained its position,

> Given the fact that the felony-murder rule is a legal fiction in which the intent and the malice to commit the underlying felony is "transferred" to elevate an unintentional killing to first-degree murder, we are reluctant to extend the doctrine to include cases in which there was no intent to commit the felony at the time of the killing. Thus, in a felony-murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim.

*Id.* at ___. In terms of proving such intent, the supreme court announced "that a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id.* at 108.

In reviewing the facts in *Buggs* and applying the previously announced principles, the high court concluded that the jury could reasonably have inferred that Buggs formed an intent to kill the victim prior to or concurrently with the murderous act. The court reasoned,

> The defendant returned home for the express purpose of obtaining more money to buy cocaine. When Ms. Beasley attempted to thwart this purpose, he stabbed her until she no longer resisted. He then proceeded to fulfill his original purpose; he went into a drawer in the bedroom where he removed all the cash that remained . . . and went back to the crack house, where he spent the remainder of the night smocking crack cocaine and consorting with a prostitute.

*Id.* at ___.

In the instant case, we have no hesitation in concluding that the killing and the underlying felony were closely connected in time, place, causation, and continuity of action. The question thus becomes whether a rational trier of fact could reasonably infer from the evidence presented that the defendant intended to commit the theft prior to, or concurrently with, the fatal assault.

Based on his actions in staging the victim's suicide, including information in the "suicide" note that he had the victim's truck and cell phone, notifying law enforcement of the location of the victim's truck, and cooperating with law enforcement and giving a detailed confession, the defendant forcefully insists that the only reasonable inference to be drawn was that he killed the victim and thereafter took the truck, cell phone, and puppy as an afterthought only to mislead the police into believing that he was elsewhere when the victim had committed suicide. To be sure, the defendant's interpretation is one reasonable inference that could be reached by a rational juror; however, it is most assuredly *not the only* reasonable inference that can be drawn from the evidence, and when reasonable inferences collide, a properly functioning adversarial system of justice respects the jury's verdict.

In our opinion, the jury could rationally infer that the victim's murder was committed in the perpetration of a robbery. Practically concurrent with shooting the victim, the defendant began staging the "suicide." He, *inter alia*, wiped up blood, placed the gun in the victim's hand, and composed a suicide note. For the staged "suicide" to seem plausible, obviously the defendant needed an alibi, which required taking the victim's truck to leave the scene and the cell phone so he could be reached and appear surprised by news of the victim's demise. Rather than an afterthought, the felony reasonably could be viewed as an essential and integral part of the staged suicide calculated to divert suspicion from the defendant. Consequently, even if stealing the victim's property was only a means of confounding the police, a jury nevertheless could reasonably infer that the defendant had the requisite intent to commit the underlying felony before, or at the very least concurrent with, the act of shooting the prone victim who posed no immediate threat to the defendant.

Following the well-settled rules governing our review of the sufficiency of the convicting evidence, we affirm the defendant's felony murder conviction.

In conclusion, the facts, circumstances, and reasonable inferences of this case support the jury's verdict finding the defendant guilty of especially aggravated robbery and of first degree felony murder. The judgments of the trial court are, accordingly, affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE